**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**ASHLEY WESTON**                                                    **PLAINTIFF**

**V.**                              **CASE NO. 5:24-CV-5050**

**TYSON SHARED SERVICES, INC.**                          **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

**TABLE OF CONTENTS**

I.  FACTS .................................................................................................. 2

II.  LEGAL STANDARD ........................................................................... 14

III.  DISCUSSION..................................................................................... 15

   A.  FMLA Discrimination/Retaliation ...................................................... 16

   B.  EPA Violation.................................................................................... 22

   C.  ACRA Retaliation............................................................................. 24

Plaintiff Ashley Weston sued Defendant Tyson Shared Services, Inc. for violating the Family and Medical Leave Act ("FMLA"), the Equal Pay Act ("EPA"), and the Arkansas Civil Rights Act ("ACRA") following the termination of her employment with Tyson. Now before the Court is Tyson's Motion for Summary Judgment (Doc. 43).[1] For the reasons that follow, the Motion is **GRANTED** and the case is, accordingly, **DISMISSED WITH PREJUDICE**.

---

[1] The Court has reviewed both parties' Statements of Fact (Docs. 44 & 52), Ms. Weston's Response in Opposition (Doc. 51), both parties' briefs in support of their respective positions (Docs. 45 & 53), Tyson's Reply (Doc. 59), and a number of sealed documents filed by the parties (Docs. 50 & 56).

## I. FACTS

Ashley Weston has spent much of her career at Tyson. After some years working on the production side, she joined Tyson's corporate office in 2020. (Doc. 44, ¶¶ 1–2). In early 2023, Ms. Weston's role was "reclassified" from "Manager of Training and Development" to "Tier 2 Team Lead Learning." *Id.* ¶ 3. Tyson asserts that this change "expand[ed] [Ms. Weston's] training responsibilities and increase[ed] the job's demands." *Id.* Ms. Weston asserts that this was "mainly a change in title," but she testified that the change came with "more responsibilities" and more time at work. (Doc. 52, ¶ 3.A; Doc. 43-1, pp. 29:22–30:2 (Weston Depo.)).[2]

Ms. Weston was a Team Lead in the Poultry Group and "supported training and development for employees" at Tyson's raw poultry facilities. (Doc. 44, ¶¶ 4–5). There were equivalent Team Lead positions for Tyson's other business units, e.g., the Beef Group. (Doc. 44, ¶ 6). After the reclassification, Ms. Weston was one of eight Tier 2 Team Leads, three of whom served the Poultry Group while the other five served other business units.[3]

Prior to the events giving rise to this litigation, Ms. Weston had no disciplinary history at Tyson. (Doc. 52, ¶ 1.B). In July 2023, Tyson added an additional layer to the reporting structure, inserting Eric O'Cain between the Tier 2 Team Leads and the Poultry Group's prior boss, Stephen King. (Doc. 44, ¶ 10; Doc. 52, ¶ 8.A). Ms. Weston had "no

---

[2] Where documents (like Ms. Weston's deposition) are internally numbered, pincites reference those internal page numbers.

[3] The three Poultry Group Team Leads were Ms. Weston, Charley Christianson, and Vanessa Davis. The Team Leads for other business units were Suzie Rodriguez, Hannah Briggs, Curtis Boone, Aaron Butler, and Nathan Meyer.

issues" working under Mr. King but had mixed feelings about the prospect of working under Mr. O'Cain. (Doc. 44, ¶ 9; Doc. 52, ¶ 12).

Around this time, Ms. Weston was experiencing a serious medical issue that she learned would require surgery. (Doc. 44, ¶ 13; Doc. 52, ¶ 14.A). She told both Mr. King and Mr. O'Cain that she was experiencing this issue. (Doc. 44, ¶ 13; Doc. 51-70, p. 2). On Friday, July 21, 2023, Ms. Weston initiated a request for leave with Tyson's third-party leave administrator, Sedgwick, and informed Mr. O'Cain that she had done so. (*Id.* ¶ 16; Doc. 52, ¶ 16.A). In Ms. Weston's case, Sedgwick would provide only after-the-fact approval for leave. *See* Doc. 43-7, p. 1 ("Your Time Away Begins: August 10, 2023"; "Your completed documentation is due on August 25, 2023."). Therefore, Mr. O'Cain acted as "the gatekeeper" for whether Ms. Weston could take leave before Sedgwick had formally approved it. (Doc. 51-6, pp. 62:20–63:10 (Weston Depo.)). The same day Ms. Weston filed her request for leave, Mr. O'Cain sent Ms. Weston a to-do list as "feedback" in her Workday account. (Doc. 51-21, p. 3). Ms. Weston interpreted this as Mr. O'Cain "clearly trying to begin his paper trail for—either for [her] performance review or for [her] employment." (Doc. 51-6, p. 55:13–17).

On July 26 or 27, Ms. Weston initiated a new request with Sedgwick for reduced-schedule leave backdated to July 24. (Doc. 43-7, p. 2; Doc. 51-70, p. 2). On August 1, Mr. O'Cain emailed a human resources representative about creating a counseling statement for Ms. Weston because of tasks she had failed to complete the prior week. (Doc. 51-17). The next day, August 2, Mr. O'Cain texted Ms. Weston requesting she provide a "half day schedule." (Doc. 51-70, p. 2). Ms. Weston responded, "It's difficult to determine a 4 hour schedule because I can't predict times that I will be severely ill or in a lot of pain," but Mr.

O'Cain again asked her to "create a half day schedule so I will know when you're scheduled to work." *Id.*

After this exchange, Mr. O'Cain again left feedback, this time public, on Ms. Weston's Workday account describing "some of the challenges we've faced," listing two "examples" of tasks Ms. Weston had failed to complete—the same tasks described in his email to HR the day before. (Doc. 51-21). The comment also listed expectations like "only prioritize items you think you can do within the 4 hour block" and "If you cannot complete an item on time, please state that when the deadline is established." *Id.* It concluded with "Let's meet later today, as you requested. Then, I would like to reduce your schedule, discuss a coverage plan, and discuss the above examples." *Id.*

Ultimately, Ms. Weston began full medical leave that day. (Doc. 44, ¶ 18). She asserts that she was supposed to be on reduced-schedule leave beginning July 21 but Mr. O'Cain "would not allow her to work a reduced schedule." (Doc. 52, ¶ 19.A). Sedgwick retroactively approved her leave after it began. (Doc. 43-7, pp. 4, 6–7).

Ms. Weston "underwent surgery on August 10 and returned to work on September 5." (Doc. 44, ¶ 20). Sometime before or immediately after her leave, Ms. Weston accessed compensation information about her peers via Workday. (Doc. 51-1, pp. 14:3–10, 15:10–16, 16:2–5 (Bell Depo.)). After a technology change earlier in the year, HR employees like Ms. Weston had increased access to information about other Tyson employees in Workday. *Id.* at p. 14:3–10. She had told Mr. King, back when he was her boss, that she had too much access, namely that she could see other employees' social security numbers, but nothing was done to restrict her access. (Doc. 51-4, pp. 22:24–23:9 (King Depo.)).

4

Ms. Weston says she was prompted to look at the compensation information because she was told by a recruiter that there was a wide pay gap amongst her Tier 2 peers. (Doc. 51-6, p. 71:2–10 (Weston Depo.)). Indeed, she looked in Workday and found that Suzie Rodriguez and Charley Christianson were making about $30,000 more in base salary than she was. *Id.* p. 75:4–8. She also learned that two of her male coworkers had been given $10,000 stock bonuses in 2022; at that time, Ms. Weston had three peers in the Poultry Group. Both of the men got bonuses, while Ms. Weston and the other woman did not. *Id.* at p. 76:9–24. Mr. King, her supervisor at that time, testified that the bonuses were based on seniority and the additional responsibilities the men had taken on, which Ms. Weston has not disputed. (Doc. 43-6, pp. 21:13–22:4 (King Depo.); Doc. 52, ¶ 31–32).

On her second day back from leave, Ms. Weston met with Suzie Rodriguez, a Team Lead for a different business unit, who had been covering for Ms. Weston and was trying to get her back up to speed. (Doc. 43-8, p. 3). During that meeting, Ms. Weston asked Ms. Rodriguez whether she had gotten a raise because she had "heard from someone in the team there was an increase in pay." *Id.* Ms. Rodriguez was uncomfortable with this question and asked Ms. Weston who had disclosed this information to her, but Ms. Weston refused to say. *Id.* Ms. Rodriguez reported the conversation to Mr. O'Cain, who reported it up to Mr. King and HR representative Kaylee Bell. *Id.*

Tyson asserts that Ms. Weston accessed this compensation information in violation of Tyson's Confidentiality Policy. (Doc. 44, ¶¶ 22–23). Tyson filed a copy of this policy with a publication date of March 19, 2019. (Doc. 43-12). Ms. Weston asserts that she had never seen Tyson's Confidentiality Policy before she was disciplined and that the

provision she allegedly violated was added to Tyson's Confidentiality Policy only after she accessed the compensation information. (Doc. 52, ¶ 23.A). On September 12, in response to Ms. Rodriguez's complaint, Ms. Bell emailed Mr. O'Cain about "issuing an HR Confidentiality Agreement" and asked him to "Have everyone sign a copy and upload it into Workday[.]" (Doc. 43-8, p. 2).

Also on September 12, Ms. Weston "confronted" Mr. King about the perceived pay disparity, and he responded, "First, how do you even know Charlie and Susie got an increase? . . . I will schedule a call to discuss. However, Eric needs to be the one to tell you how to perform to earn a raise." (Doc. 52, ¶ 24; Doc. 51-24, p. 5). When Ms. Weston raised the issue with Mr. O'Cain shortly thereafter, he also asked her how she had gotten information about her colleagues' pay. (Doc. 52, ¶ 24.C). Ms. Weston's written communications at the time characterized the question as what she needed to do to be considered for a salary increase. (Doc. 51-24, p. 5); (Doc. 51-28). Ms. Weston asserts that the pay disparity was never explained. (Doc. 52, ¶ 25.C). On September 25, Tyson issued her a disciplinary action notification for accessing the compensation information; she was not otherwise disciplined. (Doc. 44, ¶ 25). Another employee who accessed the compensation information was also disciplined. *Id*.

At the same time, Ms. Weston was also expressing concern that Mr. O'Cain was punishing her for taking FMLA leave, including to Mr. O'Cain himself. In emails to Mr. O'Cain in early September, Ms. Weston told Mr. O'Cain that his expectations were "unrealistic"; that she should not have been held to the same standard as her peers in the period before she took leave because she should have been on a reduced schedule starting July 21 but for his instruction to wait on the Sedgwick approval; and that she was

struggling to meet his expectations upon her return because the turnaround times were too soon after her leave. (Docs. 51-23 & 51-26). Ms. Weston expressed her concerns to Ms. Bell on September 15, stating that she was "beginning to fear that [her] job [wa]s at risk" and that she could not "figure out what [she] ha[d] done other than take a leave of absence to have surgery & seek clarity regarding salary potential." (Doc. 51-28). She claimed that Mr. O'Cain was subjecting her to "a level of scrutiny and ridicule regarding [her] performance" and that the negative Workday feedback he had left her was for a time she was "supposed to be on a reduced schedule." *Id.* Ms. Bell later instructed Mr. O'Cain to remove his Workday feedback. (Doc. 51-1, p. 27:3–9 (Bell Depo.)).

By Ms. Weston's account, things "had finally begun to improve with Eric's plot to terminate [her] after taking an fmla leave until the day before he latched onto all this"—"all this" referring to Ms. Weston's performance on the Humboldt project. (Doc. 51-65, p. 2). The Humboldt project was Tyson's effort to recruit and train 300 new full-time employees at its Humboldt chicken deboning plant by the end of the year to replace contract workers Tyson wished to eliminate. (Doc. 52, ¶¶ 34–35). On October 10, Mr. O'Cain tasked Ms. Weston with "develop[ing] logistics to support a 'mass hiring plan' for the Humboldt operation." (Doc. 44, ¶ 35). "The Humboldt Project was the largest 'mass hiring event' that [Ms. Weston] had experienced." (Doc. 52, ¶ 35.B). Debone training for a new employee took six weeks. *Id.* ¶ 35.C. Mr. O'Cain gave Ms. Weston a "plan outline," detailing what kind of information he wanted included, such as a "Flex Matrix"—a chart identifying the "trainers," i.e., plant employees who can train the new hires, and their respective abilities to train each part of the debone process. Mr. O'Cain wanted a Flex

Matrix for the project to "show gaps in where we might have opportunities or needs to train other [trainers]." (Doc. 43-14; Doc. 43-3, p. 75:19–24 (O'Cain Depo.)).

Ms. Weston "developed a plan the same day the project was given to her." (Doc. 52, ¶ 35.D). Her plan was "only for 2 weeks" and included Flex Matrices for those weeks. (Doc. 51-35, pp. 2, 4). When she shared the plan with others involved in the Humboldt project, she noted, "This is not a full proof plan but the best I could come up with in 24 hours," and the Humboldt Complex HR manager, Brittanie Lewis, responded, "Looks good!" (Doc. 51-34). Ms. Weston also began asking managers from other plants to volunteer to bring trainers from their plants to Humboldt to help. (Doc. 51-32). Authority over trainers had recently been moved from corporate to plant management, so Ms. Weston did not have direct authority to order trainers from other plants to Humboldt. (Doc. 52, ¶ 36.A).

While her work on the project seemed to be off to a fine start in October, Ms. Weston struggled to get up-to-date information about new hires from Ms. Lewis. (Doc. 52, ¶ 39.A). Hiring at the plant was also off to a slow start, so on two occasions Ms. Weston cancelled the additional training personnel she had scheduled to send to the plant because she did not think they were needed. (Doc 51-39; Doc. 51-41). The complex manager later complained to Ms. Weston "that he wished the support had been spread out more." (Doc. 51-55).

On Friday, November 3, things took a turn when contract workers at the plant staged a mass walkout after layoffs began. (Doc. 51-44). HR partner Amy Ford emailed the team: "We are in full on all hands-on deck mode. What additional support can we provide from an onboarding / learning perspective? We are going to need every able

body, mind, and resource that we can get." *Id.* Mr. O'Cain forwarded the email to Ms. Weston with the message "This one is a 911" and gave instructions to update the list of those planning to travel to help with training and to "[u]pdate our numbers and plans to handle double the apps." *Id.* Ms. Weston responded on Monday that there were not a lot of people signed up to help the following week and that it would be "extremely helpful" to have updates from Ms. Lewis about hiring number because "[u]ntil now I have been given reason to believe resources were not needed." *Id.* Ms. Ford responded:

> I am confused as to why you thought resources were not needed. I felt we left the planning with the understanding that we needed a solid plan that we could implement immediately. The walk out last week could not have been predicted. I would also encourage you to attend as many of my staff meetings as possible. We share a lot of great updates on there.

(Doc. 51-45). Mr. O'Cain asked Ms. Weston to include trainer-to-trainee ratios in her reports so they would know whether they needed to bring in more assistance. *Id.* He later forwarded her a report from the recruiting team as an example of "what [he] [was] looking for from learning." (Doc. 51-53).

Mr. O'Cain also asked Ms. Weston about why she was not on Ms. Ford's update calls and Ms. Weston told him "Charley wanted to be on" them. (Doc. 51-47). Ms. Weston then apologized to Ms. Ford for missing the call but told her that "Charley wanted to be the learning support on your calls . . . . It can become confusing if we are all attending the calls though . . . ." (Doc. 51-49). Ms. Ford pushed back: "I don't think it's confusing for multiple learning leads to attend the calls." *Id.*

Tyson asserts that around this time, Mr. O'Cain received negative feedback about Ms. Weston from other employees, namely Dylan Stroud, Amy Ford, Ryan Penner, and Yvette Mahann. (Doc. 44, ¶¶ 47–52). Shortly after Ms. Weston's suspension, Mr. O'Cain

also received negative feedback from Brenda Castaneda. (Doc. 43-18). Ms. Weston resists admitting that Mr. O'Cain received this feedback because Tyson has not produced "any documented discussions" of these employees' conversations with Mr. O'Cain and because Mr. O'Cain did not "remember sharing with Weston the comments that others were making about her job performance." (Doc. 44, ¶¶ 47–52). But the thrust of Ms. Weston's assertions—that Mr. O'Cain did not receive negative feedback about her—is belied by her own evidence.

Ms. Weston admits that Mr. O'Cain coached her about her performance on November 8. (Doc. 52, ¶¶ 53.A, 53.C). In a follow-up email recapping that call, she thanked Mr. O'Cain "for sharing this feedback with me so I can work to correct these things." (Doc. 51-46). The email then described the feedback Mr. O'Cain had given her and her plan to address it, naming the individuals who had given said feedback: Yvette, Lisa, and Amy. *Id.* The feedback from Amy: "[She] didn't think my team was as prepared as they should be to assist at Humboldt." *Id.*

Mr. O'Cain described her response to coaching conversations as "often combative"—"she would raise her voice at me. . . . She would often become really angry, really frustrated, and I was accused of babysitting her . . . ." (Doc. 43-3, p. 79:11–21 (O'Cain Depo.)). Ms. Weston denies this, pointing to the above follow-up email and another email later that day where she reported to Mr. O'Cain, "Everything is in a great place with Amy & Yvette." (Doc. 51-50).

The following Tuesday, November 14, Ms. Weston had another Humboldt project meeting. The day before, she sent Mr. O'Cain an email update and he responded, "We're

going to need more info." (Doc. 43-13, p. 6).[4] She sent a separate update to all involved—except Mr. O'Cain—at about 3:30 AM on the 14th. The email included a chart with trainer-to-trainee ratios for the upcoming week. It did not include a Flex Matrix. It also did not contain a plan for the following week—"Next week being a holiday week we have not been able to find anyone to come at this time . . . ." (Doc. 51-54). Ms. Weston herself refused to be there over the holidays. (Doc. 51-55). By the end of the day on the 14th, she had found someone else to cover the holiday week. (Doc. 51-59).

An hour and a half before the meeting, Ms. Weston sent Mr. O'Cain the PowerPoint she planned to present. (Doc. 44, ¶ 41; Doc. 43-15). The five-slide PowerPoint titled "Onboarding Back Up Plan" did not include a Flex Matrix, trainer-to-trainee ratios, or any information about the cost of training the new hires. (Doc. 43-16). The "plan" for ensuring adequate trainers going forward was the same as it had been—volunteer sign-ups for offsite support. It did not identify in what weeks offsite support would be needed, in what numbers, or in which parts of the process qualified onsite trainers were lacking. *Id.*

Everyone agrees that the meeting did not go well. (Doc. 44, ¶ 42; Doc. 52, ¶ 42.A). Ms. Weston says plant management was happy with her initial plan, but on the day of the presentation, corporate management was not happy with her updated plan. Ms. Weston claims they were unhappy because she suggested they push back the training deadline for the new hires by a couple of weeks. (Doc. 51-6, p. 94:2–25 (Weston Depo.)). Mr. O'Cain, by contrast, says they were unhappy because the presentation "lacked the

---

[4] Ms. Weston asserts that Mr. O'Cain's email was sent after her presentation. (Doc. 52, ¶ 45.B). In Tyson's copy of the email, the time sent reads "12:22 PM." (Doc. 43-13, p. 6). In Ms. Weston's copy, the time sent reads "6:22:26 PM (UTC)." (Doc. 51-58). UTC is six hours ahead of CST, so the email was sent at 12:22 PM local time, as Tyson's copy reflects, which was before Ms. Weston gave her presentation.

analytics, the data [they] would need to make certain decisions." (Doc. 43-3, p. 75:3–8 (O'Cain Depo.)). Ms. Ford was also not "happy with [Ms. Weston's] plan because [Ms. Ford] wanted something new that we have never done before," but Ms. Weston says "[n]obody once ever asked [her] to come up with a plan that was different than anything we had ever done before." (Doc. 51-6, p. 94:2–4 (Weston Depo.) ("Amy was not pleased with my suggestion. And Eric was obviously not pleased because she wasn't pleased . . . ."); Doc. 51-24, p. 12; Doc. 51-65, p. 2).

Ms. Weston concedes that her "written 'plan' for the Humbolt project did not recite all of the various components that Eric O'Cain thought it should" but claims that her "work 'on the ground' did." (Doc. 51-6, ¶ 10). She claims that she was never given "an absolute deadline" to complete the written plan and that she was "continually working" on it but because Mr. O'Cain kept giving her more things he wanted her to add, it was more of a "work in progress." *Id.* ¶ 11. Notably, mid-November is about six weeks (the training period) before the end of the year (the deadline).

After the meeting on the 14th, the decision was made to suspend Ms. Weston pending investigation, and Mr. O'Cain called to inform her. (Doc. 52, ¶ 57). Ms. Weston was not given a reason for her suspension at that time. *Id.* The day after she was suspended, Ms. Weston emailed Mr. O'Cain and Ms. Bell defending her performance and accusing Mr. O'Cain of retaliating and harassing her for taking a leave of absence and discriminating against her for being a woman. (Doc. 51-59). Ms. Weston also texted Mr. King the day of and in the days after her suspension asking about why she was being investigated and accusing Mr. O'Cain of targeting her. (Doc. 51-24, pp. 8–9, 11). Mr. King

responded, "Let the investigation play out. I don't know all the details but I know HR can't talk about the investigation until it's over." *Id.*

The HR investigation was led by HR representative Kaylee Bell, to whom Ms. Weston had complained about Mr. O'Cain back in September. Ms. Bell "gather[ed] Mr. O'Cain's concerns and interview[ed] the employees who had previously raised performance issues." (Doc. 44, ¶ 58). Ms. Weston also emailed Ms. Bell shortly after her suspension describing the problems she had been having with Mr. O'Cain. She suggested three other people for Ms. Bell to contact "to see if [Ms. Weston] was recruiting support from them." (Doc. 51-1, pp. 40:20–41:9 (Bell Depo.)). Ms. Bell did not do so. *Id.* Ms. Weston also says that Ms. Bell's investigation failed to consider contradictory evidence, namely positive feedback and encouragement from other employees to Ms. Weston in the weeks leading up to her suspension. (Doc. 52, ¶¶ 58–59).

While the investigation was pending, Ms. Weston made an ethics complaint with Tyson alleging that she was discriminated against for taking leave and on the basis of gender and was retaliated against for reporting the same. (Doc. 51-63). The ethics investigation did not begin until after Ms. Weston was terminated and was closed six days later. (Doc. 52, ¶ 57.H).

On November 27, Ms. Bell, Mr. O'Cain, and Mr. King, in consultation with Ms. Bell's supervisor John Roller, decided to terminate Ms. Weston, and Ms. Weston was informed. (Doc. 52, ¶ 62). Ms. Weston asserts that she was not given a reason for her termination until December 11, when Ms. Bell told her "[t]he termination resulted from performance failures and an overall loss of confidence in leadership." (Doc. 51-67). Ms. Weston's previous emails, however, establish that she was told why she was being terminated

before December 11: On November 28, Ms. Weston emailed Ms. Bell: "I would like to know the reason or code used in my termination. You stated it had something to do with Humboldts plan to replace 300 contract team members before Dec. 31st but didn't give the actual reason for the term." (Doc. 51-65).

She also emailed: "One reason you mentioned being considered in the termination discussion this afternoon was that I had requested to have Stephen and Eric removed from an email chain and basically tried to prevent them from being in the loop. I expressed to you that this was in fact incorrect and that Eric had directed me to do so . . . ." *Id.* Indeed, in one email chain about Ms. Ford's weekly calls, Mr. O'Cain asked Ms. Weston to remove him and Mr. King from the chain. (Doc. 51-50). In others, Ms. Weston: (1) told Mr. O'Cain, "I wish they would take you off the email." (Doc. 51-47); (2) asked recruiting lead Dylan Stroud to remove Mr. King from the chain and said, "I may reach out to Eric and see if he would like to be removed." (Doc. 51-51); (3) told Ms. Ford, "I also intended to ask for Stephen to be removed from the communication and possibly Eric if he is good with that." (Doc. 43-13, p. 23); and (4) neither Mr. O'Cain nor Mr. King were included on her 3:30 AM email November 14 relaying her plan for Humboldt going forward (Doc. 51-54).

After her termination, Ms. Weston timely filed this lawsuit. Tyson moves for summary judgment on all claims.

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir 1999) (quoting Fed. R. Civ. P. 56). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2)

14

the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). The moving party bears the burden of proving the absence of any material factual disputes and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The Court must "view[ ] the evidence and draw[ ] all reasonable inferences most favorably to the nonmoving party." *Dimock v. City of Brooklyn Ctr.*, 124 F.4th 544, 548 (8th Cir. 2024) (citation omitted). "However, only facts that are genuinely disputed are viewed most favorably to the nonmovant." *Id.* (citation omitted). "A fact is not genuinely disputed if a party's story is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### III.  DISCUSSION

Ms. Weston's Complaint asserts three counts. Count I alleges Tyson violated Ms. Weston's rights under the FMLA by terminating her for taking leave and for her complaints the Mr. O'Cain was punishing her for taking leave. Count 2 alleges Tyson violated the EPA by paying her less than male employees who performed the same work. Count III alleges Tyson violated the ACRA by retaliatorily firing her because of her complaints about disparate treatment on the basis of gender. The Court addresses each of these claims below.

## A. FMLA Discrimination/Retaliation

"The FMLA was designed to protect, in relevant part, the reasonable medical needs of employees with serious health conditions within the limits set by the employer's legitimate interest in managing its business." *Scobey v. Nucor Steel-Ark.*, 580 F.3d 781, 786 (8th Cir. 2009). It "entitles employees to take twelve weeks of leave from work during any twelve-month period if the employee meets certain statutory requirements." *Boston v. TrialCard, Inc.*, 75 F.4th 861, 868 (8th Cir. 2023) (citing U.S.C. § 2612(a)(1)). Although Ms. Weston asserts a single FMLA count, her allegations reflect two substantively distinct claims: discrimination and retaliation. Discrimination occurs when "an employer takes adverse action against an employee because the employee exercises rights to which she is entitled under the FMLA." *Id.* Retaliation occurs when "an employee opposes any practice made unlawful under the FMLA and the employer retaliates against the employee." *Id.* Here, Ms. Weston alleges that she was terminated both for taking leave and for opposing discrimination based on having taken leave. The legal contours for these claims are roughly the same, although the conduct precipitating the adverse action is different.

"Whether characterized as a 'discrimination' claim under § 2615(a)(1), or as a 'retaliation' claim under § 2615(a)(2), [courts] require proof of the employer's discriminatory intent. Such proof may come from direct evidence or indirect evidence using the *McDonnell Douglas* burden-shifting framework." *Corkrean v. Drake Univ.*, 55 F.4th 623, 630 (8th Cir. 2022) (citations omitted). Ms. Weston concedes that she does not have direct evidence of discriminatory intent, so the Court proceeds under *McDonnell Douglas*.

16

Under that framework, the employee bears the initial burden of establishing a prima facie case of retaliation or discrimination. If the employee meets her burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its challenged actions. The burden then shifts back to the employee to show that the proffered reason is pretextual. *Id.* at 630–31.

To make out a prima facie case of discrimination or retaliation, Ms. Weston must show: "(1) that [s]he engaged in activity protected under the Act [taking leave or opposing an unlawful practice], (2) that [s]he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action."[5] *Corkrean*, 55 F.4th at 631.

Tyson asserts that Ms. Weston cannot make out the third element of her prima facie case, causation. It argues that the multi-month period between Ms. Weston's leave and her termination is insufficient, as a matter of law, to establish causation. (Doc. 45, p. 11 (citing *Kipp v. Mo. Highway & Transp. Comm'n.*, 280 F.3d 893, 897 (8th Cir. 2002))). The Court agrees that if the only connection between Ms. Weston's leave and her termination was timing, that would be insufficient to establish causation. But timing is not the only connection. Ms. Weston also points to actions Mr. O'Cain took much closer in time to her leave request—Workday feedback the day she initiated her leave request, an inquiry to HR about creating a counseling statement for Ms. Weston while her leave

---

[5] The Supreme Court recently held that an adverse action need not be "materially adverse," i.e., causing "'significant' harm," to sustain a discrimination claim under Title VII. *Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024). Tyson concedes that Ms. Weston suffered a materially adverse employment action—termination—so the Court need not consider whether her FMLA discrimination claim should be held to the lower bar set in *Muldrow*.

request was pending, and more Workday feedback, this time public, the day Ms. Weston started leave.

Ms. Weston also insists that Mr. O'Cain gave her unrealistic deadlines once she was back on the job to punish her for taking leave and to lay the groundwork for firing her. "But taking FMLA leave does not give an employee any greater protection against termination for reasons unrelated to the FMLA than was available before." *Siebrecht v. Mercy Health Servs.*, 2026 WL 22072, *6 (8th Cir. Jan. 5, 2026) (citation modified). While it seems that Ms. Weston had a rough transition back to work which was made rougher by Mr. O'Cain's management, she then continued working under him for over a month without performance issues—when, in her own words, things had "finally begun to improve," (Doc. 51-65, p. 2)—until the Humboldt walkout, substantially weakening the inference that his aggressive supervisory tactics were discriminatory rather than dispositional. And Ms. Weston does not allege that her placement on the Humboldt project was itself improper.

The protected activity for which Tyson allegedly retaliated against her—reporting to Mr. O'Cain and Ms. Bell that Mr. O'Cain was punishing her for taking leave—also occurred in mid-September, immediately before things improved and Ms. Weston and Mr. O'Cain worked together without issue for over a month. This intervening period dilutes Ms. Weston's causation showing, but the Court will nonetheless proceed to Tyson's proffered justifications for Ms. Weston's termination.

Tyson asserts that Ms. Weston was terminated because of her poor performance, particularly on the Humboldt project. Ms. Weston has failed to show Tyson's reasons for her suspension and termination were pretextual.

An employee can demonstrate that her employer's asserted justification for terminating her is pretextual in a number of ways, including by "show[ing] that the employer's explanation is unworthy of credence because it has no basis in fact" or by otherwise "adduc[ing] enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions." *Corkrean*, 55 F.4th at 631 (citation modified); *Burciaga v. Ravago Americas LLC*, 791 F.3d 930, 937 (8th Cir. 2015).

Ms. Weston advances two arguments for pretext, neither persuasive. First, she argues that Tyson's performance rationale is unworthy of credence because, while she admittedly failed to produce the written plan that Mr. O'Cain wanted, she was accomplishing everything on the floor and no one complained that the new hires were not being adequately trained. (Doc. 53, p. 10). But providing written reports about one's work is a perfectly legitimate task for an employer to assign—a task Ms. Weston admits she did not complete. It's also not clear to the Court how on the floor implementation, no matter how successful, can substitute for the numbers and analytics Tyson needed in order to make forward-looking determinations about resource allocation.

Ms. Weston's work on the Humboldt project speaks for itself. After the walkout, Mr. O'Cain directed Ms. Weston to "[u]pdate our numbers and plans to handle double the apps." (Doc. 51-44). Ms. Weston did not do so. At the time of her termination, Ms. Weston had only planned one week out, a little over six weeks before the end of the year when the six weeks of training needed to be completed. While Ms. Weston says "[n]obody once ever asked [her] to come up with a plan that was different than anything we had ever done before," it was clear from the "911" "full on all hands-on deck" situation post-walkout that

she was expected to produce a plan that went beyond business as usual. (Doc. 51-44). Ms. Weston claims that Mr. O'Cain was setting her up, but Ms. Ford was also unhappy with Ms. Weston's work on the Humboldt project—in fact, Ms. Weston testified that Mr. O'Cain was unhappy *because* Ms. Ford was unhappy—and there is no evidence that Ms. Ford knew about Ms. Weston's leave or her complaints about Mr. O'Cain.

The feedback Mr. O'Cain received about Ms. Weston's performance is also consistent with Tyson's justification. Even disregarding complaints from coworkers that lack documentary support, it is beyond dispute that at least four of Ms. Weston's coworkers—Amy Ford, Lisa Barnett, Yvette Mahann, and Brenda Castaneda— complained about her performance in the month before her termination. Tyson's performance justification clearly has a basis in fact.

At the time of her termination, Ms. Weston was also told one of the reasons for her suspension was that she asked to or did remove Mr. O'Cain and Mr. King from email chains about the Humboldt project. Ms. Weston asserts that this reason is also pretextual because Mr. O'Cain told her to remove him from an email chain. It is true that Mr. O'Cain did ask on one occasion to be removed from an email chain, but on multiple other occasions Ms. Weston asked him if she could remove him, and on one occasion she excluded him from an email with over twenty other recipients. *See supra* pp. 13–14. This justification, too, has a basis in fact.

Ms. Weston asserts that in conducting its investigation, Ms. Bell failed to consider positive information about her job performance. This amounts to nothing more than an argument that her performance failures "weren't serious enough to merit [her] termination." *Winters v. Deere & Co.*, 63 F.4th 685, 691 (8th Cir. 2023). But that argument

"merely questions the soundness of [Tyson's] judgment, and does not demonstrate pretext for discrimination." *Id.*

Second, Ms. Weston argues that the evidence gives rise to an inference of discriminatory intent and raises a genuine doubt about the legitimacy of Tyson's proffered justifications. She claims that Mr. O'Cain, Mr. King, and Ms. Bell's silence in the face of her accusations immediately after her suspension suggests discriminatory intent because they "should have denied Weston's allegations if they did not believe them to be true." (Doc. 53, p. 20). Ms. Weston cites no support for this proposition, perhaps because no court has or would conclude that an employee's failure to respond to their suspended coworker's accusations supports such an inference.

> A man cannot make evidence for himself by writing a letter containing the statements that he wishes to prove. He does not make the letter evidence by sending it to the party against whom he wishes to prove the facts. He no more can impose a duty to answer a charge than he can impose a duty to pay by sending goods. Therefore a failure to answer such adverse assertions in the absence of further circumstances making an answer requisite or natural has no effect as an admission.

*A. B. Leach & Co. v. Peirson*, 275 U.S. 120, 128 (1927).

She also claims a jury could infer discriminatory intent because it took Tyson two weeks after her termination to come up with a justification. But Ms. Weston acknowledged the reasons offered for her termination—the same reasons Tyson asserts in this litigation—the day after her termination. Her claim that it took Tyson until December 11 to come up with a reason for her termination is so "blatantly contradicted by the record" that no reasonable jury could believe it. *Scott v. Harris*, 550 U.S. at 380.

And Ms. Weston's continued complaints during her suspension and after her termination cannot themselves establish that her concededly deficient performance was

a pretextual reason for her termination. "Otherwise, a problem employee on thin ice with the employer could effectively insulate herself from discipline by engaging in protected activity." *Corkrean*, 55 F.4th at 633 (citation omitted). Ms. Weston has not "offered sufficient evidence for a reasonable trier of fact to infer discrimination." *Winters*, 63 F.4th at 690 (citation modified). *See Brandt v. City of Cedar Falls*, 37 F.4th 470, 475–76, 480 (8th Cir. 2022) (holding that FMLA plaintiff failed to meet her burden of demonstrating pretext when "[s]he testified that she believed [her supervisor] may have instructed staff to find errors in her work, and she began receiving negative performance evaluations for the first time since beginning her employment" because there was no evidence "demonstrating that these documented performance deficiencies were inaccurate").

## B. EPA Violation

"The Equal Pay Act prohibits pay discrimination on the basis of sex. A plaintiff must first establish a prima facie case that women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions." *Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 981 (8th Cir. 2022) (citation modified). If the prima facie case is established, the burden shifts to the defendant to "prove that any wage differential is explained by (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* (citation modified).

Ms. Weston points to two pay differentials to establish her prima facie case: in 2022, the two men in the Poultry Group were awarded discretionary bonuses while the two women were not; and around the time of the "Tier 2" reclassification in 2023 when one of the men in the Poultry Group retired, the remaining man was given a base salary

increase while the two women were not, although his base salary was already higher than the two women's. Ms. Weston asserts that all the members of the Poultry Group did the same work.

With respect to the stock bonuses, Tyson argues that even if Ms. Weston has made out a prima facie case, the bonuses were based on seniority and merit—factors other than sex. It is undisputed that Mr. Sanders received his bonus because he "had been with Tyson for '30 or 40' years, was a 'great performer,' and was performing extra work around the time of his nomination." (Doc. 44, ¶ 31). And it is undisputed that Mr. Christianson was also nominated for his bonus because he took on additional responsibilities that Ms. Weston did not. *Id.* ¶¶ 32–33. Seniority and merit are legitimate reasons for wage differences.

With respect to the base salary differences, Tyson asserts that the appropriate comparator group is all eight employees in the Tier 2 Team Lead Learning position for the Poultry Group after the reclassification and that, looking at that group, women were not paid less than men for the same work. Ms. Weston disputes that all eight Team Leads were in the Poultry Group, asserting that this group included members of other business units. Even accepting that, Ms. Weston's own conduct and evidence wholly rebut her argument that the Team Leads for other business units were not her peers for salary purposes: The first thing Ms. Weston did upon learning about this salary differential was approach Ms. Rodriguez—a woman outside the Poultry Group—to ask her how she had gotten a raise. (Doc. 43-8, pp. 3–4; *see* Doc. 51-3, pp.5:24–6:2 (Davis Depo.)). Among these eight employees, Mr. Christianson and Ms. Rodriguez were paid significantly more than the other six, Ms. Weston made $90 more than the minimum salary for the position,

and all five others—including three men—made the minimum salary. Ms. Weston has not made out a prima facie case that women were paid less than men for the same work.

### C. ACRA Retaliation

Finally, Ms. Weston alleges that Tyson violated the ACRA by retaliating against her for engaging in protected activity, namely objecting to the perceived gender pay disparity. The ACRA protects "[t]he right to obtain and hold employment without discrimination" "because of . . . gender." Ark. Code Ann. § 16-123-107(a). It prohibits "discriminat[ion] against any individual because the individual in good faith has opposed any act or practice made unlawful by this subchapter." *Id.* § 16-123-108(a).

Like Ms. Weston's FMLA retaliation claim, her ACRA retaliation claim is subject to the *McDonnell Douglas* burden-shifting framework because she lacks direct evidence of discriminatory intent. *Warren v. Nucor Corp.*, 150 F.4th 990, 996–97 (8th Cir. 2025). "To establish a prima facie case of retaliation, an employee must prove that (1) he engaged in protected conduct, (2) he suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Id.* at 997 (citation modified).

As with Ms. Weston's FMLA claim, Tyson disputes only the third element, causation. Ms. Weston raised the pay disparity issue mid-September. She was disciplined for accessing compensation information on September 25. No further action was taken against her until over a month later when she was suspended pending investigation. The temporal connection between Ms. Weston's protected conduct and her suspension and termination is insufficient as a matter of law to establish a prima facie of retaliation. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

24

But even if Ms. Weston had made out a prima facie case, she has failed to show that Tyson's non-retaliatory justification for her termination was pretextual for all the reasons stated with respect to her FMLA retaliation claim.

### IV.  CONCLUSION

**IT IS THEREFORE ORDERED** that Tyson's Motion for Summary Judgment (Doc. 43) is **GRANTED** and the case is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this 19th day of January, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE